UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON

Electronically Filed

| | |
|---|---|
| KATRINA EVERSOLE, et al., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No.: 05-124-KSF |
| ) | |
| EMC MORTGAGE CORPORATION, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AGAINST EX PARTE CONTACTS WITH DEFENDANT'S CURRENT EMPLOYEES AND AGAINST MISLEADING ADVERTISING

### INTRODUCTION

Defendant EMC Mortgage Corporation ("EMC") filed this motion asking this Court to restrain the James Hoyer firm, plaintiff Katrina Eversole's principal lawyers, from continuing its extraordinary campaign of disparaging EMC in widely publicized advertising and of contacting or attempting to contact EMC's current employees.

The motion and accompanying papers showed that James Hoyer had produced and aired a 30-second advertisement that among other things accused EMC of mishandling borrowers' monthly payments, making harassing phone calls and threatening borrowers with foreclosure. The motion also showed that James Hoyer has aggressively sought to contact EMC employees, including at least one of its current managers.

James Hoyer's opposition does not deny these facts. The firm admits it prepared and aired the misleading advertisement. It concedes it tried to contact a current EMC employee.

11474/0003/607437.1

Unable to deny its wrong-doing, James Hoyer offers threadbare excuses for its conduct and urges that this Court is powerless to halt the firm's misdeeds. James Hoyer is wrong on both counts, as explained below.

Moreover, James Hoyer's campaign is far broader and more scurrilous than EMC realized when it filed this motion on November 15. About ten days later, EMC discovered that James Hoyer had posted a 10½ minute video on YouTube, a popular publicly viewed website. The video contains clips of dissatisfied borrowers complaining about their treatment by EMC. In addition, the video features Alfred Scudieri, who says he is a James Hoyer investigator. Scudieri narrates much of the video, repeatedly disparaging EMC. Among other such remarks, Scudieri says that James Hoyer's investigation of EMC has built its business plan around a plot to cheat clients and has committed fraud so blatant it just "jumps out at you." McClendon Aff., ¶4.

The ad and video are disparaging and misleading. They state or imply that James Hoyer's investigation has uncovered proof for the ad's and video's outrageous accusations against EMC. James Hoyer has presented no such proof to this Court, either in support of Eversole's class certification motion or in opposition to this motion. If the firm has the evidence but withheld it in seeking class certification, it failed to represent the putative class adequately. On the other hand, if James Hoyer lacks the evidence, its ad and video are disparaging and misleading.

The Court should grant this motion and put a halt to James Hoyer's improper vilification of EMC in public media. Litigation should be carried out in court, not by airwaves and Internet. This Court has ample power under Fed. R. Civ. P. 23(d) and its inherent powers to rein in errant conduct of attorneys who appear before it in class actions like this one. It should exercise that power here and enter the requested injunction.

## SUPPLEMENTAL STATEMENT OF FACTS

As EMC discovered only after filing this motion,[1] James Hoyer's publicity campaign encompassed more than the 30-second advertisement mentioned in EMC initial moving papers. James Hoyer has also produced a 10 minute, 30 second video. On October 30, 2006, the firm posted the video on www.YouTube.com, a popular website for publicly sharing videos.[2]

The video can be viewed by anyone, simply by entering the following URL into any Internet browser program: <http://www.youtube.com/watch?v=xVk42dKO1gM>. EMC's Request for Judicial Notice. As of December 16, the YouTube website showed the video had been viewed 708 times. McClendon Aff., ¶2. The video is further publicized by postings to The Mortgage Servicing Fraud Forum (and possibly other websites) which link to the YouTube site, allowing curious viewers instant access to the video. McClendon Aff., ¶6.

The video begins with a photo of an EMC office building while Alfred Scudieri's voice-over states: "EMC's business practices hurt consumers every day. These are EMC's customers." A woman, later identified as Connie Farrington, appears, saying: "It's been a nightmare. It truly has." A man, later identified as "Tom Milonas—Victim," comes on next, saying: "It

---

[1] This is one of the rare instances when new evidence may properly be introduced on reply. Here, EMC had no knowledge of the YouTube video when it filed this motion and had no reason to suspect it existed. The video introduces no new legal issues on this motion, but only additional evidence to support the arguments EMC made in its initial motion papers. James Hoyer cannot claim surprise. It was well aware of the video, having produced and publicly posted it. Indeed, James Hoyer's coy silence about the video in its opposition could well be seen as deliberately misleading the Court as to the true nature and extent of the firm's extraordinary campaign to disparage EMC. Filing a new motion based on the recently discovered video would be a waste of effort, time and money for the litigants and the Court

EMC will not oppose a motion by James Hoyer to file a surreply limited to a response to the new evidence of its YouTube video.

[2] "YouTube is a popular free video sharing Web site which lets users upload, view, and share video clips." Wikipedia, "YouTube"; <http://en.wikipedia.org/wiki/YouTube>. "YouTube is one of the fastest-growing websites on the World Wide Web, and is ranked as the 10th most popular website on Alexa, far outpacing even MySpace's growth. According to a July 16, 2006 survey, 100 million clips are viewed daily on YouTube, with an additional 65,000 new videos uploaded per 24 hours. The site has almost 20 million visitors each month, according to Nielsen/NetRatings ...." *Id.* (fns. omitted).

makes you feel violated. It makes you feel like they're a bunch of cheaters. They almost cost me my home. They almost made my children homeless. I've got three young children. It's all—it was a nightmare." A little later in the video Milanos reappears. Asked if he's ever met a company like this before, he answers, "Yeah, on TV, I think they're called the Sopranos, the Gambinos, yeah, I've seen people like that before." McClendon Aff., ¶3.

Then Scudieri is shown, with the title Al Scudieri, Chief Investigator. He states:

> I'm Al Scudieri. For more than 25 years, I investigated fraud cases for the FBI. Now I'm with the James Hoyer investigative law firm, investigating EMC. I'm being assisted by two other former FBI agents, a former sheriff's detective, and two former investigative news reporters. The case is currently under the supervision of a former federal prosecutor. Throughout the past 35 years, I've investigated all kinds of frauds. Bank frauds, insurance frauds, mortgage frauds, securities and stock frauds and Ponzi schemes. Each case has its own little twist, but all of them have a common denominator: Someone lied to steal someone else's money.
>
> Some frauds are so sophisticated they are difficult to detect, others just jump out at you. The allegations of fraud at EMC are the kind that just jump out at you.

McClendon Aff., ¶4.

The video continues in this vein, switching from pictures of borrowers, to a scroll of names of borrowers who have allegedly sent complaints to James Hoyer, to EMC buildings, to Scudieri, while the sound track intersperses clips of borrowers' complaints with Scudieri's narration. McClendon Aff., ¶5. Both complaints and narration are highly inflammatory. Scudieri's narration includes the following statements:

> Our investigation shows that EMC derives much of its profits from imposing improper late fees and foreclosures not from servicing loans like legitimate mortgage companies.
>
> \* \* \*
>
> Unscrupulous loan servicing companies prey on consumers who are first time buyers or who have poor credit. These people tend to

be less savvy about their rights. They're afraid of losing their homes. They'll do anything to save them, even if it means paying questionable fees or waiving their rights.

\* \* \*

As bad as these problems are for home owners, what makes it worse is that it was all planned. That's right. EMC schemed to hit its clients with excessive fees and even take away their homes.

\* \* \*

Too incredible to believe that a mortgage company owned by Bear Stearns would actually build its business plan around a plot to cheat clients? Well, we've actually interviewed insiders and here's what they told us: EMC is purchasing loans on the secondary market not only because they are profitable but because they are held by the kind of people who are easily duped into paying exorbitant fees. EMC's employees delay credit payments just so late fees can be imposed. They routinely hound and threaten customers. If they don't pay, foreclosure follows. EMC's own training manuals not only feature the foreclosure option, they even ridicule their customers.

\* \* \*

Failing to disclose EMC's purchase of a mortgage; intentionally delaying credit of payments to assess late fees; harassing and threatening clients; scheming to foreclose—all violations of federal law. More than 1,000 EMC customers saying the same thing make a pretty loud noise. This is one of those cases that just jumps out at you.

Id.

## ARGUMENT

As already indicated, James Hoyer admits that it produced and aired the disparaging 30 second advertisement "dozens of times." Opp., 8; Savino Aff., ¶6. It concedes that the webpage featuring the ad has "been up for months." Opp., 8. James Hoyer admits that it repeatedly attempted to contact one of EMC's current managerial employees. Savino Aff., ¶6. It cannot deny having produced and publicly posted the 10½ minute YouTube video described above.

Instead, James Hoyer attempts to excuse its misconduct and to say that this Court can do nothing about such misbehavior. It is wrong on both points. This Court has ample power to deal with misconduct of lawyers appearing before it in putative class actions like this one. James Hoyer's excuses cannot mask its abusive behavior. Indeed, the excuses only make the misconduct worse, showing James Hoyer acted intentionally to circumvent this Court's rulings and authority.

Lawsuits should be litigated in the Court, not on the Internet, television or other public media. Lawyers should not solicit contacts with the opponent's current employees. Lawyers should not engage in a public campaign of disparaging the opponent in order to coerce settlement. James Hoyer has violated all these rules.

Now is the time for the Court to reassert control over the conduct of this case before it spirals further out of control and before EMC suffers further unwarranted harm to its reputation and its relationships with borrowers and clients. The Court should grant the motion.

### A. A Rule 23(d) Order May Issue Without Any Underlying Cause Of Action Against The Order's Target

Contrary to James Hoyer's first argument, Opp., 2-5, this Court may enter an order enjoining the firm from committing further misconduct even though EMC has not alleged or shown a probability of success on a cause of action against the firm.

The argument is based on the notion that a preliminary injunction motion "must be predicated on a cause of action ... regarding which a plaintiff must show a likelihood or actuality of success on the merits." Opp., 3, citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 109, 1097 (11th Cir. 2004). The very case James Hoyer cites explains, however, that this rule applies only to "traditional" injunctions, not to other types of restraining orders that the Court may issue under other authority and for other reasons:

> Whereas traditional injunctions are predicated upon some cause of action, an All Writs Act injunction is predicated upon some other matter upon which a district court has jurisdiction. Thus, *while a party must 'state a claim' to obtain a 'traditional' injunction, there is no such requirement to obtain an All Writs Act injunction*—it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior. The requirements for traditional injunctions do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.

*Klay*, 376 F.3d at 1100 (fn. & citations omitted) (emphasis added).

Here, EMC has moved for a restraining order under Fed. R. Civ. P. 23(d).[3] Rule 23(d) orders are "of a different ilk" from "traditional" injunctions, and are not governed by Rule 65 standards.[4] *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1201 (11th Cir. 1985); Manual for Complex Litig., §21.33 n. 917, p. 301 (4th ed.).

A motion for a Rule 23(d) order need not be predicated on a cause of action against the party to be enjoined. *E.g., In re McKesson HBOC, Inc. Securities Litig.*, 126 F.Supp.2d 1239, (N.D. Cal. 2000) (injunction under rule 23(d) against rival plaintiff's law firm's misleading solicitations of opt outs to pursue individual suits); *In re Domestic Air Transp. Antitrust Litig.*, 1992 WL 357433 at *1-2 (N.D. Ga. 1992) (injunction under rule 23(d) against company charging class members unauthorized fees for helping file claims in class action settlement). The moving party need only make a specific evidentiary showing of particular abuses, such as misleading communications by counsel, that have a detrimental effect on the fair administration of justice in a class action. *In re Community Bank*, 418 F.3d 277, 310-11 (3d Cir. 2005).

---

[3] Rule 23(d) provides: "In the conduct of actions to which this rule applies, the court may make appropriate orders: ... (3) imposing conditions on the representative parties or on interveners ... [and] (5) dealing with similar procedural matters."

[4] In its initial moving papers, EMC miscited Rule 63, instead of Rule 65, in passing, as authority for this motion. The text of the opening memorandum made clear, however, that the motion was primarily based on Rule 23(d).

Rule 23(d) orders do not serve as redress for torts committed against the moving party. Instead, Rule 23(d) orders issue under the Court's "broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

"[A] district court's authority under Rule 23(d) is not limited to communications that actually mislead or otherwise threaten confusion, but extends to communications that interfere with the proper administration of a class action or those that abuse the rights of members of the class." *In re Currency Conversion Fee Antitrust Litig.*, 361 F.Supp.2d 237, 252-53 (S.D. N.Y. 2005). Rule 23(d) orders may issue to regulate communications with putative class members before as well as after class certification. *Keystone Tobacco, Inc. v. U.S. Tobacco Co.*, 238 F.Supp.2d 151, 154 (D. D.C. 2002).

In particular, the Court may wield its authority under Rule 23(d) to prevent class plaintiffs from "us[ing] widespread publication of their claims, disguised as class communications, to coerce defendants into settlement ...." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997). Such widespread publicity "surely caus[es] serious and irreparable harm to [the defendant's] reputation and to its relationship with its employees [and customers]." *Id.;* accord: *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 678 (N.D. Ga. 1999). Accordingly, a Rule 23(d) order may properly enter against public dissemination of the claims, by a website posting or other means, particularly when, as in this case, the plaintiff has no legitimate need to air the charges publicly. *Abdallah*, 186 F.R.D. at 678.

As more than one court has noted, "class actions create the opportunity for a kind of legalized blackmail: a greedy and unscrupulous plaintiff might use the threat of a large class action, which can be costly to the defendant, to extract a settlement far in excess of the individual

claims' actual worth." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784-85 (3d Cir. 1995).[5] For James Hoyer, legalized blackmail apparently is not enough. Its ad and video seek by other, improper means to coerce an unwarranted settlement. Rule 23 was designed to curb just such abuses of the class action procedure. *Id.*, at 785. Rule 23(d), in particular, gives the Court ample means to prevent James Hoyer's wrongful conduct.

The Court is also "endowed with certain powers inherent in its authority to administer justice in cases before it." *Cannon v. Cherry Hill Toyota, Inc.* 190 F.R.D. 147, 161 (D. N.J. 1999), *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). "This power may be invoked to regulate the conduct of lawyers appearing before it and, when necessary, may be invoked to impose sanctions on those lawyers who violate the Rules of Professional Responsibility ... or the general obligations of attorneys practicing in federal courts to work towards a just, speedy and efficient resolution of claims." *Cannon*, 190 F.R.D. at 161; *see also Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 566-67 (3d Cir. 1985).

No cause of action need be stated against the errant lawyer before the Court may issue an order under its inherent powers. Rather, "[t]he invocation of the Court's inherent powers is particularly appropriate when an attorney's conduct has been pervasive and amounts to violations of several rules, and appears to the Court to demonstrate a course of bad faith actions that transcend any rule or rules of the Court." *Id.* "It is well-established that ordinarily 'the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge,' and is thus a matter of judicial discretion." *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1383 (10th Cir.1994).

---

[5]  *See also Castano v. American Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995); *American Bankers Ins. Co. v. Booth*, 830 So.2d 1205, 1211 (Miss. 2002); *Ramon v. Aries Ins. Co.*, 769 So.2d 1054, 1056 (Fla. App. 2000); J. Landers, *Of Legalized Blackmail and Legalized Theft: Consumer Class Actions and the Substance-Procedure Dilemma*, 47 So.Cal.L.Rev. 842, 845 (1974).

### B. The Court May Enter Appropriate Orders To Prevent Threatened, As Well As Punish Actual, Ethical Violations

James Hoyer next urges that the Court can do nothing to stop its efforts to contact EMC's employees because the law firm did not *actually* know that Ty Fawley was a current managerial employee when it repeatedly tried to contact him. Opp., 5-8.

James Hoyer is wrong. The Court need not wait until the horse is out of the barn. It can enjoin incipient violations of the Rules of Professional Responsibility as well as punish completed transgressions.

Here, James Hoyer admits it is aggressively attempting to contact EMC employees. Though it claims it wants to contact only former employees, the law firm admits it repeatedly tried to speak with Ty Fawley, a current EMC managerial employee. James Hoyer's only excuse is that it did not know Fawley was a current employee.

That self-serving plea of innocence is belied by James Hoyer's self-proclaimed premier status as an "investigative" law firm, employing ex-FBI agents, sheriffs' detectives, and investigative reporters. With so many supposedly skilled investigators on staff and assigned to the firm's EMC offensive, it is scarcely credible that the firm could not figure out Fawley's current employment.

Savino apparently tracked Mrs. Fawley down at her place of employment, a middle school. Savino Aff., ¶6. Had he put equal effort into locating Mr. Fawley's current place of employment, he could undoubtedly have divined that Fawley was still an EMC employee. Indeed, not even that much effort was needed. Savino could simply have asked Mrs. Fawley if her husband was still employed by EMC. That Savino did not take this simple precaution says volumes about James Hoyer's professed innocence.

Giving the law firm the benefit of much doubt, it did not know for sure Mr. Fawley was a current EMC employee—but only because it made no effort to learn the truth. It was much more convenient to rely on the word of one ex-employee and then raise the shield of ignorance and innocence when caught red-handed.

The Court need not and should not tolerate such transparent efforts to circumvent the Rules of Professional Responsibility. It has the power to prevent incipient violations. The Court need not wait until James Hoyer actually succeeds in contacting a current EMC employee. It can, for example, require that James Hoyer ascertain a supposed ex-employee's current employment before asking him or her any other question and require that James Hoyer inquire about current employment when it contacts third persons (like Mrs. Fawley) in efforts to reach those it hopes are EMC's ex-employees.

### C. James Hoyer Cannot Justify Its Disparaging Advertisement Or Video

Turning to its advertisement, James Hoyer first claims that EMC has not shown it disparaging or misleading. Opp., 8, 13. Nonsense. "[T]he primary evidence in a false advertising case is the advertising itself." *Williams v. Gerber Prod. Co.*, 439 F.Supp.2d 1112, 1115 (S.D. Cal. 2006).

Here, James Hoyer's 30 second advertisement is plainly disparaging. *See DaimlerChrysler Corp. v. Askinazi*, 2000 WL 964753 at *4-6 (E.D. Pa. 2000). It expressly accuses EMC of mishandling borrowers' monthly payments, making harassing phone calls and threatening borrowers with foreclosure. It is misleading in suggesting these problems are wide-spread or systemic. James Hoyer has no evidence to back that charge. It presented none in support of its motion to certify a class in this case, when proof of widespread or systematic wrong-doing might have vindicated the putative class members' rights.

The YouTube video is far worse. It expressly accuses EMC of fraud; indeed, fraud so blatant "it just jumps out at you." It compares EMC to the Mafia (the Sopranos and Gambinos). It claims EMC "schemed to hit its clients with excessive fees and even take away their homes" and "actually build its business plan around a plot to cheat clients." It further suggests that these outrageous accusations are backed by the results of James Hoyer's investigation and its interviews with EMC "insiders." If James Hoyer has such explosive evidence, it breached its fiduciary duty to the putative class by failing to produce the evidence in support of its class certification motion. Suggesting it has such evidence when it does not is misleading, as a matter of law.

Next, James Hoyer says EMC "misstates the scope of the ad and the webpage," which it says are intended to support its nationwide investigation of EMC, not merely this lawsuit in which it seeks a Kentucky-only class. Opp., 8-9. The fact that Kentucky residents may respond to the ad or webpage (or video), James Hoyer says, is "patently insufficient to warrant" the relief EMC seeks. *Id.*

Plainly, this is no defense. That James Hoyer cast its "investigatory" net widely and publicized its disparaging and misleading messages to a national audience cannot preclude this Court from entering appropriate orders to stop this improper conduct. Kentucky residents may access the disparaging advertisement on the James Hoyer website and the misleading video on the YouTube website as easily as anyone else. The fact that others may view those sites as well simply magnifies the harm from James Hoyer's improper tactics, increasing the firm's leverage in attempting to coerce an unmerited settlement. *See Jackson*, 130 F.3d at 1004; *Abdallah*, 186 F.R.D. at 678. By causing greater, more widespread, harm, James Hoyer does not immunize itself from this Court's exercise of authority to control the conduct of the lawyers appearing before it in this putative class action.

Finally, James Hoyer quotes *Bernard*, 452 U.S. at 104, for the proposition that the mere possibility of abuses does not justify routine adoption of a communications ban. Opp., 9. Here, the abuses are not merely possible. The advertisement and video actually exist. James Hoyer actually tried, on repeated occasions, to contact Fawley. Nor is EMC seeking any routine communications ban. Rather, it is asking for an order narrowly tailored to stopping the abuses its evidence has identified, and James Hoyer has admitted committing. As *Jackson* and *Abdallah* show, nothing in *Bernard* prevents the Court from entering the requested order under such circumstances. Indeed, in *Abdallah*, the court required the plaintiff to purge a website of far less disparaging material than James Hoyer has posted on its own and YouTube's websites. This Court should follow *Abdallah's* lead.

### D. James Hoyer's Misconduct Cannot Be Justified As Necessary To Prepare Its Case For Trial

"[T]here are critical policies indicated [sic: implicated] in counsel's being able to conduct informal discovery, through contacts with victims and former employees," James Hoyer next asserts. Opp., 11. "The Internet is rife with evidence of EMC's misconduct" and, it says, James Hoyer must be allowed to investigate those complaints "to serve its clients, EMC victims and the public at large."[6] *Id.*, 10.

These pious protestations are wholly unconvincing. James Hoyer may conduct informal discovery. It may investigate. It may contact ex-employees. It may even take formal discovery. James Hoyer does not need disparaging and misleading websites, advertising, and YouTube videos to undertake any of that legitimate pretrial work. It can make appropriate inquiries to

---

[6] This case will eventually be tried in court where rules of evidence will apply, not on the Internet where every rumor or innuendo appears to take on a life of its own for plaintiffs' counsel. Citing Internet gripe sites as justification for James Hoyer's own disparaging and misleading Internet postings is circular reasoning at its worst.

avoid contacting EMC's current employees. Doing so will not hinder any legitimate investigatory efforts.

For hundreds of years, parties—even plaintiffs in class actions—have managed to prepare their cases capably for trial without resorting to the sort of improper tactics James Hoyer has employed here. James Hoyer has made no effort to show why this case is any different from any of the thousands of others that plaintiffs have adequately prepared without going to such extremes. There is no special need in this case for trial by Internet.

### E. The First Amendment Does Not Shield James Hoyer's Misconduct

Contrary to James Hoyer's final plea, Opp., 12-13, the First Amendment does not shield its conduct from this Court's regulation. The First Amendment clearly does not shield James Hoyer's attempted contacts with EMC's employees. James Hoyer does not claim otherwise.

As James Hoyer concedes, disparaging or misleading lawyer advertising is not entitled to constitutional protection. Opp., 12. Without offending the First Amendment, the government (or its courts) may prohibit lawyer advertising that is inherently misleading or deceptive. *In re R.M.J.*, 455 U.S. 191, 202-03 (1982).[7]

Here, James Hoyer's advertisement and video are disparaging and misleading, on their face, for the reasons described above. *See* pp. 11-13, above. Thus, there is no constitutional

---

[7] *Peel v. Attorney Disciplinary Comm'n*, 496 U.S. 91 (1990) stands for no contrary proposition. There, the attorney's challenged letterhead was literally true: he had been certified as trial specialist by National Board of Trial Advocacy. The language James Hoyer quotes rejected the state's argument that though literally true, the indication of specialist certification might nevertheless prove misleading to some unsophisticated potential clients. Here, the Court deals with no such subtleties. James Hoyer's advertisement and video are disparaging and misleading on their face. EMC need not present consumer surveys to prove that fact. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652 (1985) (A state need not "conduct a survey of the ...public before it [may] determine that the [advertisement] had a tendency to mislead" when "the possibility of deception is as self-evident as it is in this case.") Proof of actual consumer deception is necessary only "where the ad at issue contains a truthful statement that is nonetheless misleading." *Farrin v. Thigpen*, 173 F.Supp.2d 427, 437 (M.D. N.C. 2001).

impediment to the Court's ordering James Hoyer to purge them from its and other websites. *See Abdallah*, 186 F.R.D. at 678.

### F. Conclusion

For the reasons mentioned above and for those stated in EMC's opening memorandum, the Court should grant this motion and enter an order barring James Hoyer from publicly disseminating disparaging or misleading advertising regarding EMC and from attempting to contact EMC's current employees. In particular, the Court should order James Hoyer to purge its 30-second advertisement from its and seek its removal from others' websites. It should order James Hoyer to withdraw its video from the YouTube website. It should direct James Hoyer to inquire about current employment before contacting and before commencing a communication with any past or present EMC employee.

Respectfully submitted,

Thomas P. O'Brien III
FROST BROWN TODD LLC
400 West Market Street
32nd Floor
Louisville, Kentucky 40202
(502) 589-5400
tobrien@fbtlaw.com

and

John B. Sullivan
Regina J. McClendon
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, 26th Floor
San Francisco, California 94111
(415) 398-3344
rjm@severson.com


By: /s/ Regina J. McClendon
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

     I hereby certify that on December 18, 2006, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to Robert R. Sparks, Mark Fistos, and Steven Jaffe. I further certify that I sent the foregoing document by U.S. mail to the following non-CM/ECF participants:

John A. Yanchunis
James, Hoyer, Newcomer & Smiljanich, P.A.
4830 W. Kennedy Blvd., Suite 550
Tampa, FL  33609


                                 By: s/ Regina J. McClendon
                                     COUNSEL FOR DEFENDANT